FILED
 2016 May-18  AM 11:57
U.S. DISTRICT COURT
    N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| DAMIUN COX, | } |
| | } |
|     Plaintiff, | } |
| | } |
| v. | }    Case No.: 5:13-cv-02132-MHH |
| | } |
| LOGICORE CORPORATION, | } |
| | } |
|     Defendant. | } |

## MEMORANDUM OPINION AND ORDER

Plaintiff Damiun Cox is a former employee of defendant LogiCore Corporation. He is African-American. Mr. Cox contends that LogiCore terminated him because of his race, in violation of 42 U.S.C. § 1981 and Title VII.[1] LogiCore has filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. Because genuine issues of material fact preclude summary judgment, the Court denies LogiCore's motion.

### I.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as

---

[1] In his complaint, Mr. Cox also asserted a retaliation claim. In his summary judgment response, Mr. Cox abandoned this claim. Therefore, the Court dismisses that claim upon LogiCore's motion and will not address it in this opinion.

a matter of law." Fed. R. Civ. P. 56(a).  To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).  When considering a summary judgment motion, a court must view the evidence in the record and draw reasonable inferences in the light most favorable to the non-moving party.  *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).  "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## II. RELEVANT FACTS

### A. LogiCore's Contract with AMCOM

LogiCore is a company based in Huntsville, Alabama.  LogiCore contracts with the government to provide logistics services in several locations worldwide. (Doc. 23-3, p. 6).  One of those contracts involves the Theater Aviation Maintenance Program ("TAMP").  (*Id.*).  Under TAMP, LogiCore must provide maintenance and supply support for Army rotary-wing and fixed-wing aircraft on

military bases in Iraq, Kuwait, and Afghanistan.  (Doc. 23-3, pp. 6, 8).  LogiCore's customer under the contract is the United States Army Aviation and Missile Command ("AMCOM"), the entity responsible for development and production of all U.S. Army aviation and missile systems. (Docs. 23-3, p. 5; 23-4, ¶¶ 1–2). AMCOM is a government civilian entity separate from the Army.  (Doc. 23-3, p. 4).  LogiCore has three primary contacts at AMCOM: Chris Oyelette, the AMCOM deputy director of logistics, a Hispanic man (Docs. 23-1, p. 23; 23-8, p. 28); Janet Huys, the contracting officer's representative, a white woman (Doc. 23-3, p. 9); and Tim McLeod, a technical director, a white man (Docs. 23-1, p. 23; 23-5, ¶ 2).  Oyelette, Huys, and McLeod primarily work from Huntsville.  (Doc. 23-3, p. 9).  AMCOM works closely with LogiCore, but AMCOM does not have authority to hire or fire LogiCore employees.  (Docs. 23-8, p. 17; 23-13).

LogiCore employs a program manager who oversees TAMP.  The project manager is based in Huntsville.  (Doc. 23-3, p. 9).  LogiCore's lead employee in southwest Asia is known as the in-theater lead, and he is responsible for all LogiCore TAMP employees in Iraq, Kuwait, and Afghanistan.  (Doc. 23-3, p. 15). Employees assigned leadership responsibilities on particular bases are called Forward Operating Base Representatives ("FOB Reps").  (*Id.*).

Military personnel on the bases supported by TAMP are part of the Theater Aviation Support Maintenance Group ("TASMG").  (Doc. 23-3, p. 35).  TASMG

3

personnel are normally part of national guard units, and the TASMG commander is the highest-ranking officer on the base. (Doc. 26-6, pp. 6, 8). LogiCore employees work closely with TASMG personnel on-base to assist with procuring, shipping, and receiving aviation parts. (Doc. 23-8, p. 13).

### B. Mr. Cox's Employment with LogiCore

LogiCore hired Mr. Cox in 2010 to serve as an FOB Rep on a base in Afghanistan. (Docs. 23-6, p. 32; 26-2, p. 218). Mr. Cox was involved in shipping, receiving, locating, and keeping inventory of aircraft parts. He was responsible for keeping the Army aircraft adequately supplied and maintained. (Docs. 23-6, p. 9; 26-3, p. 147). Mr. Cox received several commendations, awards, and strong evaluations during his employment, (Doc. 26-3, pp. 107–27), and he was eventually promoted to Afghanistan lead in June 2011. (Doc. 26-2, p. 221). As Afghanistan lead, he continued his FOB Rep responsibilities and essentially served as the in-theater lead over the Afghanistan bases while Kevin Traylor (black male) served as the in-theater lead for the bases in Iraq and Kuwait. (Docs. 23-6, p. 37; 23-7, p. 6). Mr. Cox worked closely with Mr. Traylor and with Al Hopkins and Byron Hatfield (both black males), who served as program managers at different times while Mr. Cox worked for LogiCore. (Docs. 23-1, p. 5; 23-3, p. 7; 23-6, p. 11).

### C. Complaints About Mr. Cox

Soon after Mr. Cox's promotion, Mr. McLeod began complaining about him. Mr. Hopkins testified that Mr. McLeod voiced displeasure at Mr. Cox's promotion, stating – without providing details – that he did not think that Mr. Cox was the best selection. (Doc. 23-7, p. 7). Mr. McLeod approached Mr. Hopkins a few weeks after Mr. Cox's promotion and complained that Mr. Cox did not speak up and answer a question posed by a general during a conference call when Mr. Cox knew the answer. (Doc. 23-7, p. 8). Mr. Hopkins testified that Mr. Cox should have answered the question, but Mr. Hopkins spoke to Mr. Cox about the issue and did not consider it serious. (Doc. 23-7, p. 9). Mr. McLeod also mentioned that he understood that Mr. Cox had been performing personal services for military personnel on the base, an act prohibited by the contract between LogiCore and AMCOM. When Mr. Hopkins requested details, Mr. McLeod only mentioned that Mr. Cox had been making coffee for servicemen, though Mr. Hopkins did not think such behavior was inappropriate. (Doc. 23-7, p. 11). According to Mr. Hopkins, Mr. McLeod continued to argue for Mr. Cox's removal, doing so three or four more times. Mr. McLeod became upset when Mr. Hopkins stated his belief that there was no justifiable reason to remove Mr. Cox from the program. (Doc. 23-7, p. 9).

Mr. McLeod's complaints continued after Mr. Hatfield took over as program

manager. Mr. Hatfield testified that Mr. McLeod renewed his complaint about Mr. Cox's failure to speak up in a meeting, but Mr. Hatfield thought that Mr. Cox actually did speak up, though Mr. McLeod may not have heard the answer. (Doc. 23-12, p. 6). Mr. McLeod also mentioned the issue with coffee and personal services, including an allegation that Mr. Cox picked up dry cleaning for military officials, but Mr. Hatfield investigated and found nothing inappropriate. (*Id.*). Mr. McLeod then told Mr. Hatfield that he thought Mr. Cox was trying too hard, taking on tasks beyond his responsibility. (*Id.*). Mr. Hatfield testified that Mr. McLeod brought up Mr. Cox during every conversation, likely six or seven times within a six-month period, asking about a timetable for Mr. Cox to be removed from the project. (Doc. 23-12, pp. 7–8).

Mr. McLeod stated that he also complained to Mr. Hopkins and Mr. Hatfield that Mr. Cox was unresponsive to his attempted communications and that Mr. Cox's unresponsiveness continued after his complaints. (Doc. 23-5, ¶ 8). Neither Mr. Hopkins nor Mr. Hatfield, however, testified that Mr. McLeod made those complaints known to them.

### D. LogiCore's Termination of Mr. Cox

LogiCore replaced Mr. Hatfield with Ken Spier, a white male, as program manager in May 2012. (Docs. 23-1, p. 23; 23-8, p. 4). Soon after his promotion, Mr. Spier had an introductory meeting with Mr. McLeod and Ms. Huys.

According to Mr. Spier, Mr. McLeod and Ms. Huys expressed extreme dissatisfaction with Mr. Cox. They mentioned, but only vaguely, issues with Mr. Cox's performance and perceptions of improper relations with military members. When Mr. Spier pressed them for details, Mr. McLeod and Ms. Huys only brought up the teleconference meeting issue. Mr. Spier testified that Mr. McLeod did most of the complaining in that meeting. (Doc. 23-8, pp. 25–26). The next week, Mr. Spier again met with AMCOM, with Mr. Oyelette in attendance as well as Ms. Huys and Mr. McLeod. As the second item of business, Mr. Oyelette asked, "Are you going to take care of that problem in Afghanistan?" Mr. Spier took the comment to clearly indicate that they wanted Mr. Cox removed from his TAMP assignment. (Doc. 23-8, pp. 28–29).

Mr. Spier testified that he found the relationship between Mr. Cox and AMCOM to be unsalvageable after that meeting and decided to recommend that Mr. Cox be terminated. (Doc. 23-8, pp. 29–30). Mr. Spier recommended Mr. Cox's termination to Fred Frost (black male), LogiCore's vice president and COO. (Docs. 23-3, p. 6; 23-8, p. 30). Mr. Spier testified that he recommended termination simply because AMCOM wanted Mr. Cox off the program – he did not review Mr. Cox's personnel file, independently evaluate his performance, or investigate the allegations because the customer's decision was firmly made. (Doc. 23-8, p. 33). Mr. Frost agreed with Mr. Spier and signed the termination

7

papers, though he too was unaware of the specifics or veracity of the allegations. (Doc. 23-3, p. 28). Mr. Frost testified that he relied heavily on Mr. Spier's recommendation in making the termination decision. (Doc. 23-3, p. 26). Mr. Spier then traveled to Afghanistan and notified Mr. Cox of his termination. Mr. Spier met with sharp resistance from high-ranking military personnel who worked closely with Mr. Cox. (Doc. 23-8, p. 42). LogiCore gave Mr. Cox no official reason for his termination. (Docs. 26-3, p. 5; 23-6, p. 31). A white employee replaced Mr. Cox. Mr. Traylor testified that AMCOM selected Mr. Cox's replacement. LogiCore disputes this point. (Docs. 23-8, p. 44; 26-6, p. 22).

### E.    Mr. Cox's Allegations

After his termination, Mr. Cox contacted several high-ranking LogiCore employees to protest his firing. He did not mention in his initial complaints that he suspected race discrimination. Instead, he argued that the accusations against him were meritless and that he was respected and did good work. (Doc. 26-3, pp. 101–02). Afterwards, Mr. Cox filed a charge of discrimination with the EEOC alleging that he was terminated because of his race. (Doc. 23-2, p. 3). In this action, Mr. Cox claims that AMCOM believed that LogiCore employed too many African-Americans and that LogiCore, with full knowledge of this belief, terminated Cox to appease its customer. He relies on statements made by AMCOM and LogiCore employees and other on-base personnel to support this claim, as well as the

concurrent termination or demotion of other black LogiCore TAMP employees[2] and the pretextual nature of LogiCore's stated reasons for termination. According to Mr. Cox, Mr. Hopkins, Mr. Hatfield, Mr. Traylor, other LogiCore employees, and sergeants on-base told him that AMCOM, particularly Mr. McLeod, was unhappy with the racial makeup of LogiCore employees on TAMP and that too many African-Americans were in charge at LogiCore. (Doc. 23-6, pp. 12–13, 32–34, 37). Mr. Cox testified that, shortly before Mr. Spier's promotion, Mr. Spier said that he was going to meet with Mr. McLeod because AMCOM was not happy that there was not a "balance" on the program. Mr. Spier allegedly told Mr. Cox that things would change after he returned from the meeting. (Doc. 23-6, p. 27).

Mr. Hatfield testified that, in a meeting with Mr. Spier and Mr. Frost, Mr. Spier mentioned a perception in theater that LogiCore is prejudiced and hires too many blacks. (Doc. 23-12, p. 9). This comment is corroborated by the declaration of Wintry Drake, a black former LogiCore employee. (Doc. 26-11, ¶ 7). Mr. Spier admits hearing a comment about that perception but denies bringing it up to Mr. Frost. (Doc. 23-8, p. 23). Ms. Drake and Michelle Nobles, also a black former LogiCore employee, averred that Mr. Hopkins told them that AMCOM only wants a "white boy" to lead TAMP. (Docs. 26-10; 26-11). According to Mr. Hatfield, Mr. Frost has occasionally made comments that Mr. Hatfield believes to be racist

---

[2] Because the Court finds that genuine issues of material fact preclude summary judgment without considering this contention, the Court expresses no view on its validity.

9

against African-Americans. During one incident, Mr. McLeod did not allow Ms. Nobles to work from the TAMP facility in Huntsville. When Mr. Hatfield brought up the issue to Mr. Frost, Mr. Frost said, "Byron, you know, a n----r is a n----r, no matter how you look at it." (Doc. 23-12, pp. 16–17). According to Ms. Nobles, when Mr. Frost was discussing the same issue but was interrupted by another employee, Mr. Frost angrily said, "This is what I'm talking about, this is why the government don't want them n----rs over there any way." (Doc. 23-10, ¶ 4).

Mr. Frost, Mr. Spier, Mr. McLeod, and Ms. Huys all deny that Mr. Cox's race played any part in their actions. All but Mr. Spier deny even knowing Mr. Cox's race because they had no face-to-face interaction with him. (Docs. 23-2; 23-4; 23-5; 23-8, p. 27). Essentially all of the alleged comments are disputed, and Mr. Hopkins and Mr. Traylor, both still employed with LogiCore, testified that they do not think that Mr. Cox's termination was racially motivated. (Docs. 23-7, pp. 3, 14–15; 26-6, pp. 4, 18).

## IV. DISCUSSION

A plaintiff may establish a claim of discrimination "through direct evidence, circumstantial evidence, or through statistical proof." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008). Mr. Cox first seeks to establish his claim through direct evidence. "Direct evidence is evidence that establishes the

existence of discriminatory intent behind the employment decision without any inference or presumption." *Standard v. A.B.E.L*, 161 F.3d 1318, 1330 (11th Cir. 1998). "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the [protected classification] are direct evidence of discrimination." *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227 (11th Cir. 2002) (internal quotations and citation omitted). The Eleventh Circuit has recently held that a derogatory racial statement did not qualify as direct evidence of employment discrimination because the statement did not directly refer to the plaintiff or the plaintiff's position. *See Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1241 n.11 (11th Cir. 2016). Mr. Cox seeks to rely on Mr. Frost's racial slurs as direct evidence of discrimination, but the alleged statements were not aimed at Mr. Cox. Therefore, these statements do not constitute direct evidence with respect to Mr. Cox's termination.

Nevertheless, those statements are circumstantial evidence of racial discrimination. Mr. Cox relies upon other circumstantial evidence of discrimination, as well. The Court must evaluate his circumstantial evidence claims through the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).[3] LogiCore concedes that Mr. Cox

---

[3] *Quigg* held that the *McDonnell Douglas* framework does not apply to mixed-motive discrimination claims based on circumstantial evidence. 814 F.3d at 1237–42. Not all race discrimination claims are mixed-motive claims; a plaintiff may proceed under either a single- or

has established a prima facie case of discrimination. The burden thus shifts to LogiCore to articulate a legitimate, non-discriminatory reason for firing Mr. Cox. *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010). LogiCore "need not persuade the court that it was actually motivated by the proffered reason, but need only present evidence raising a genuine issue of fact as to whether it discriminated against [Mr. Cox]." *Id.* (internal citations omitted). "The reason offered by an employer for an action does not have to be a reason that the judge or jurors would act on or approve . . . . Instead all that matters is that the employer advance an explanation that is not discriminatory in nature." *Schoenfield v. Babbitt*, 168 F.3d 1257, 1269 (11th Cir. 2000) (internal quotations and citations omitted). If LogiCore can satisfy its burden, then the burden shifts back to Mr. Cox to produce evidence that shows that LogiCore's "proffered reason was not its true reason, which merges with [Mr. Cox's] ultimate burden of persuading the court that [LogiCore] intentionally discriminated against [him]." *Alvarez,* 610 F.3d at 1265.

---

mixed-motive theory. *See Woods v. Austal USA, LLC*, No. 09–0699–WS–N, 2011 WL 1380054, at *10 (S.D. Ala. Apr. 11, 2011) (quoting with approval a case finding "alternative ways of establishing liability under Title VII, including mixed-motive and traditional single-motive theories") (internal quotations omitted); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 260 (1989) (White, J., concurring in the judgment) ("The Court has made clear that 'mixed-motives' cases, such as the present one, are different from pretext cases such as *McDonnell Douglas* and *Burdine*. In pretext cases, 'the issue is whether either illegal or legal motives, but not both, were the "true" motives behind the decision.' In mixed-motives cases, however, there is no one 'true' motive behind the decision. Instead, the decision is a result of multiple factors, at least one of which is legitimate.") (quoting *NLRB v. Transp. Mgmt. Co.*, 462 U.S. 393, 400 n.5 (1983)). Because Mr. Cox's claim is a single-motive claim, not a mixed-motive claim, the Court will apply the *McDonnell Douglas* framework.

LogiCore contends that it fired Mr. Cox because of its "honest belief that its customer was unhappy with Cox's performance because they believed Cox was violating terms of the contract." (Doc. 22, pp. 23–24). According to LogiCore, "[i]t was the government's perception that Cox was not responsive to their communication with him and that he was performing personal services." (Doc. 22, p. 23). Based upon this evidence, the Court concludes that LogiCore has articulated a non-discriminatory reason for Mr. Cox's termination. Therefore, to survive summary judgment, Mr. Cox "must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Brooks v. Cty. Comm'n*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993)).

Mr. Cox may prove pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Viewing the record in the light most favorable to Mr. Cox, as the Court must at the summary judgment stage, the Court finds that Mr. Cox has presented probative evidence that he was actually terminated because LogiCore acted on the known desire of AMCOM to reduce the number of African-Americans assigned to the TAMP contract. Mr. Cox has presented ample evidence of a widespread perception that key AMCOM

employees, Mr. McLeod in particular, felt that LogiCore employed too many African-Americans.  Mr. Cox has presented evidence that this sentiment was expressed by Mr. Frost (Doc. 23-10, ¶ 4), Mr. Spier (Docs. 23-6, p. 27; 23-12, p. 9), Mr. Hopkins (Doc. 23-6, p. 12), Mr. Hatfield (Doc. 23-6, p. 32), Mr. Traylor (Doc. 23-6, p. 37), LogiCore employee Mark Lynn (Doc. 23-6, p. 35), and two sergeants on base (Doc. 23-6, p. 33).  There also is ample evidence that Mr. Frost and Mr. Spier terminated Mr. Cox based on AMCOM's complaints without any independent evaluation of Cox's performance or investigation into the allegations.[4] (Docs. 23-3, p. 28; 23-8, p. 33).  Mr. Spier's "balance" comment further suggests that his actions may have been motivated by this perception.  This is enough to establish a triable issue of pretext.

Ms. Huys and Mr. McLeod have both disavowed knowledge of Mr. Cox's race prior to his termination,[5] and Mr. Cox has produced little evidence of statements actually made by Ms. Huys or Mr. McLeod demonstrating their racial

---

[4] This suggests that LogiCore's given reasons for termination are unworthy of credence, indirectly demonstrating pretext.  Also indirectly suggesting pretext is the fact that LogiCore did not employ its typical employee discipline process with Mr. Cox, which according to Mr. Frost, requires that the employee be given an opportunity to improve before performance-based action may be taken.  (Doc. 23-3, p. 12).

[5] Mr. Frost's similar disavowal is of limited value, given that Mr. Spier, who heavily informed Mr. Frost's termination decision, undisputedly knew of Mr. Cox's race.

preference.[6] Knowledge of Mr. Cox's race and potential racist intent, however, are not the key inquiry. What is paramount is LogiCore's *perception* of a racist intent on the part of AMCOM and action based upon that perception to appease the customer. Because Mr. Cox has presented significantly probative evidence of such perception and action, LogiCore is not shielded by Ms. Huys's and Mr. McLeod's averred lack of knowledge.

The Court understands that most of the statements presented by Mr. Cox have been denied by the purported speakers. Those denials do not rob the statements of all value; instead, they create a triable issue of fact that must be decided by a jury, not by the Court. Nor are the statements necessarily inadmissible hearsay. A statement is hearsay only if it is offered to prove the truth of the matter asserted, but many of the disputed statements have value apart from their truth. For instance, the statements about AMCOM's beliefs could be offered to demonstrate LogiCore's perception, even if the statements could not be offered to demonstrate the actual existence of the beliefs. LogiCore will have a full and fair opportunity to refute Mr. Cox's claims and evidence at trial.

## V.   CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES**

---

[6] While such statements have not been presented, Mr. McLeod's persistence in complaining about Mr. Cox, coupled with his inability or unwillingness to provide details about the basis for his displeasure, cuts against his assertion that the issues were simply performance-related.

**IN PART** LogiCore's motion for summary judgment. The Court **DISMISSES WITH PREJUDICE** Mr. Cox's retaliation claim. Mr. Cox's claims for Title VII and § 1981 race discrimination will proceed to trial. The Court will set those claims for a jury trial. The Court will provide the parties with additional instructions in a forthcoming pre-trial order.

      **DONE** and **ORDERED** this May 18, 2016.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE